UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| ALICIA J. WADE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-cv-278 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Deputy Commissioner for Operations, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the
Commissioner filed by the plaintiff, Alicia J. Wade, on June 29, 2017. For the following
reasons, the decision of the Commissioner is **REMANDED**.

*Background*

The plaintiff, Alicia J. Wade, filed an application for Disability Insurance Benefits on
January 7, 2014, alleging a disability onset date of July 19, 2012. (Tr. 16). The Disability
Determination Bureau denied Wade's application on May 12, 2014, and again upon
reconsideration on August 4, 2014. (Tr. 16). Wade subsequently filed a timely request for a
hearing on September 3, 2014. (Tr. 16). A hearing was held on May 24, 2016, before
Administrative Law Judge (ALJ) Shane McGovern, and the ALJ issued an unfavorable decision
on June 28, 2016. (Tr. 16-30). Wade and Vocational Expert (VE) Leonard M. Fisher testified at
the hearing. (Tr. 16). The Appeals Council denied review, making the ALJ's decision the final
decision of the Commissioner. (Tr. 1-3).

Wade met the insured status requirements of the Social Security Act through December 31, 2017. (Tr. 18). The ALJ issued an unfavorable decision and made findings as to each of the steps in the five-step sequential analysis. (Tr. 16-30). At step one of the five-step sequential analysis for determining whether an individual is disabled, the ALJ found that Wade had not engaged in substantial gainful activity since July 19, 2012, her alleged onset date. (Tr. 18).

At step two, the ALJ determined that Wade had the following severe impairments: complex regional pain syndrome of right upper extremity; s/p right wrist schapholunate tear; and s/p carpal and cubital tunnel release with debridement and reconstruction. (Tr. 18). The ALJ determined that Wade's medically determinable mental impairments of depressive disorder and anxiety disorder, considered singly and in combination, did not cause more than minimal limitation in Wade's ability to perform mental activities, and therefore were non-severe. (Tr. 19).

In making this determination, the ALJ considered the paragraph B criteria for mental impairments, which required at least two of the following:

> marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

(Tr. 19). The ALJ defined a marked limitation as more than moderate but less than extreme and repeated episodes of decompensation, each of extended duration, as three episodes within one year or once every four months with each episode lasting at least two weeks. (Tr. 19).

The ALJ found that Wade had a mild limitation in activities of daily living. (Tr. 19). The ALJ considered Wade's testimony that she had trouble with personal care and household activities, but he concluded that these difficulties primarily were due to her physical impairments rather than her non-severe mental impairments. (Tr. 19).

Next, the ALJ determined that Wade had a mild limitation in social functioning. (Tr. 19). Wade indicated that isolating herself became part of her routine. (Tr. 19). However, she also stated that she did not have problems getting along with family, friends, or neighbors; that she got along fine with authority figures; and that she never had been fired or laid off from a job because of problems getting along with other people. (Tr. 19).

The ALJ determined that Wade had mild limitation in concentration, persistence, or pace. (Tr. 19). The ALJ concluded that while Wade alleged difficulty handling stress and changes in her routine, her treatment records indicated little to no difficulty with concentration and attention. (Tr. 19). Finally, the ALJ noted that Wade had experienced no episodes of decompensation. (Tr. 19). Based on the foregoing analysis, the ALJ concluded that Wade's mental impairments caused no more than mild limitations and thus were non-severe. (Tr. 19).

Wade testified that due to her upper right extremity injury and her resulting inability to do things, she experienced depression and that this depression was exacerbated when her husband died in January 2016. (Tr. 20). Wade's records indicated consistent treatment starting in June of 2013 with psychiatrist, Robert Reff, M.D. (Tr. 20). Dr. Reff diagnosed Wade with depression and anxiety and prescribed Venlafaxine, Diazepam, Amitriptyline, Zolpidem, Tramadol, and Gabapentin. (Tr. 20). Wade reported that Cymbalta was helpful for depression, but she continued to report frustration and anxiety due to ongoing symptoms in her right hand. (Tr. 20). In October of 2014, Dr. Reff prescribed Zolpidem for insomnia, and by the next month, she reported that she was sleeping better. (Tr. 20). In December of 2014, March of 2015, and April of 2015, Dr. Reff noted that Wade was in the "maintenance phase of treatment" despite ongoing anxiety. (Tr. 20). As a result, Dr. Reff reduced their meetings to quarterly rather than monthly basis. (Tr. 20). In July 2015, Wade reported "being able to hold her own," and in late

2015, Dr. Reff found that Wade was calm with no evidence of active depression. (Tr. 20). In 2016, Wade's husband committed suicide, but while the ALJ noted "increased stressors" from the event, he emphasized that her treatment records from February 2016 "indicate[d] that she tried to stay busy and put a good face forward." (Tr. 20).

The ALJ found that while her treatment records reflected some ups and downs in her anxiety and depression, longitudinally her mental health symptoms and functioning improved significantly with medication and therapy. (Tr. 20). Thus, the ALJ concluded that her mental health records indicated that her anxiety and depression had less than a minimal impact on her ability to perform basic work activities. (Tr. 21).

At step three, the ALJ concluded that Wade did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 21). After consideration of the entire record, the ALJ then assessed Wade's residual functional capacity (RFC) as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she has no use of her right dominant upper extremity. She cannot push or pull with the right dominant upper extremity. She can never climb ladders, ropes, or scaffolds and never crawl. She can have no exposure to mechanical parts, to unprotected heights, or to excessive vibration.

(Tr. 22). The ALJ explained that in considering Wade's symptoms he followed a two-step process. (Tr. 22). First, he determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical or laboratory diagnostic technique that reasonably could be expected to produce Wade's pain or other symptoms. (Tr. 22). Then, he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Wade's functioning. (Tr. 22).

Wade has alleged disability in her right arm due to a work-related accident where she fell on her right arm. (Tr. 22). Although she underwent two surgeries, ganglion blocks, Botox injections, and multiple medications, Wade indicated that she suffered from complex regional pain syndrome in her right arm with no functional use of that arm. (Tr. 22). She also stated that she had tremors in her fingers which made it difficult to sleep, despite taking medications such as Gabapentin, Tramadol, Cymbalta, Valium, and Ambien. (Tr. 22). Wade testified that she also had pain in her left wrist for which she wore a brace. (Tr. 22).

Wade has indicated that as a result of her tremors she had difficulties using her hands and arms and performing activities of daily living including: doing her hair; heavy lifting; holding things in her hands; starting her car; and caring for some of her animals. (Tr. 23). However, the ALJ noted that records from April and May of 2014 showed improvement in the tremors and functioning of her right hand after she underwent Botox injections. (Tr. 23). Furthermore, the ALJ emphasized that despite Wade's allegations, she was able to drive two times per week to the store and to doctor's appointments, care for her dog, make a meal, and open a jar with a jar opener. (Tr. 23).

The ALJ found that the evidence did not fully support Wade's allegations with respect to her functional limitations. (Tr. 23). He concluded that while Wade's medically determinable impairments reasonably could be expected to cause her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 23).

In July of 2012 at an appointment with Dr. David Musgrave, an MRI of Wade's right wrist showed a partial tear of the dorsal component of the scapholunate ligament. (Tr. 23). Dr. Musgrave referred Wade to Dr. Aaron Anderson, who diagnosed Wade with carpal tunnel

syndrome, cubital tunnel syndrome, and schapholunate ligament tear. (Tr. 23-24). Dr. Anderson also recommended that Wade should not lift, push, or pull more than five pounds. (Tr. 24). Despite undergoing a right endoscopic carpal tunnel release, right cubital tunnel release and in situ decompression with endoscopic assistance, right wrist arthroscopy with debridement of central and ulnar TFCC tears and schapholunate ligament tear, and right open schapholunate reconstruction on July 19, 2012, Wade continued to experience significant symptoms in her upper right arm. (Tr. 24). In November of 2012, Wade reported to Dr. Anderson a painful lump in her hand, shooting pains in her wrist, and sensitivity of her wrist to touch. (Tr. 24). Dr. Anderson prescribed Neurotonin and continued therapy, but in December of 2012, Wade reported continued problems. (Tr. 24). Dr. Anderson referred Wade to pain management specialist, Dr. Heather Nath. (Tr. 24).

Dr. Nath diagnosed Wade with complex regional pain syndrome (CRPS) of the right upper extremity. (Tr. 24). Dr. Nath continued Wade on Flexeril, Neurontin, Ultram, and Zofran and recommended a right stellate ganglion block. (Tr. 24). After the ganglion block did not result in any reported pain relief, Dr. Nath started Wade on Ambien to sleep and recommended an intravenous regional block. (Tr. 24). In February of 2013, after this regional block resulted in no reported pain improvement and eliminated Wade's tremors for only six hours, Dr. Nath started Wade on Xanax and a Clonidine patch to treat the tremors. (Tr. 24). Dr. Nath also returned Wade to work for four hours per day with a one-pound lifting restriction with the right hand and no limitations for the left hand. (Tr. 24). The ALJ gave Dr. Nath's opinion partial weight, finding that while the right-hand restriction and the lack of a left-hand restriction were generally consistent with the overall evidence, the 4-hour workday was not. (Tr. 24).

Wade's tremors improved for about two hours while she was on Xanax. (Tr. 25). However, it made her feel woozy, which led Dr. Nath to prescribe a topical cream and referred Wade to Dr. Steven Kalisch for pain management techniques. (Tr. 25). The ALJ noted that around March of 2013, Wade reported to Dr. Nath and Dr. Kalisch some improvements in both her pain and her tremors due to Ambien and Xanax. (Tr. 25). In April of 2013, Wade underwent another right stellate ganglion block after which she reported 100% improvement in her pain for five to six hours. (Tr. 25). Nevertheless, in May of 2013 Dr. Anderson recommended a referral to psychiatrist, Dr. Reff, and a referral for a course of occupational therapy to transfer dominance to Wade's left hand. (Tr. 25).

The ALJ found that in mid-2013 Wade's medical records indicated improvement in her condition, despite some sedation and balance issues caused by medications prescribed by Dr. Reff. (Tr. 25). According to Dr. Nath's records, Wade felt happier and was "coming to terms" with her situation. (Tr. 25). August of 2013 therapy records indicated improvements in functional independence of the right hand, including the ability to start her car and cut meat with a knife. (Tr. 25).

Wade had plateaued in therapy and therefore tried a Botox injection. (Tr. 25). However, it did not work. (Tr. 25). Wade reported pain in her left hand from overuse, for which Dr. Anderson recommended that she wear a splint. (Tr. 25). However, the ALJ noted that there was no diagnosis regarding the left wrist and found that the evidence as a whole did not support any limitation with respect to the left upper extremity. (Tr. 25). In December of 2013, Dr. Nath recommended trying a Botox injection under sedation. (Tr. 25). The ALJ found that these Botox injections resulted in an improvement of Wade's symptoms, including diminished

movement and improved function.  (Tr. 26).  Wade reported a 20% improvement in symptoms overall.  (Tr. 26).

In January of 2015, Wade saw Dr. Timothy King for her continued pain.  She reported that although she still had tremors, they went away when she slept and with Botox injections. (Tr. 26).  She also reported that the tremors improved with Xanax and Ambien.  (Tr. 26).  Dr. King concluded that Wade's symptoms were psychosomatic and had no physiological basis.  (Tr. 26).  He also expressed interest in weaning Wade off of some medications.  (Tr. 26).  The ALJ noted that Wade did not see Dr. King again and instead returned to her primary care physician, Dr. Pithadia, who completed Wade's disability paperwork.  (Tr. 26).  The ALJ noted that prior to this, Dr. Pithadia had not treated Wade for her right hand or CRPS.  (Tr. 26).

The ALJ assigned great weight to the Physical Residual Functional Capacity Assessments made by the State agency medical consultants, Dr. Fernando Montoya and Dr. M. Brill.  (Tr. 26).  Their opinions stated that Wade was capable of light exertional level work with no pushing or pulling with the right hand, no climbing of ladders, ropes, or scaffolds, and no reaching, handling, fingering, or feeling with the right hand.  (Tr. 26).  The ALJ adopted all of the consultants' limitations, including avoidance of moderate exposure to dangerous machinery and unprotected height, and added further restrictions of his own, including no crawling, no exposure to machinery and heights, and no exposure to excessive vibration.   (Tr. 26).

The ALJ assigned greater weight to Dr. Anderson's and Dr. Nath's opinions restricting Wade to lifting, pushing, and pulling no more than 1 pound with her upper right extremity, but he assigned only partial weight to Dr. Nath's opinion that restricted Wade to lifting no more than 1 pound with the "upper extremity" since it did not make a distinction between the left and right extremities.  (Tr. 27).  The ALJ gave great weight to Dr. Nath's opinion that Wade was unable to

work at her past job as a hair salon receptionist, finding it generally consistent with the overall evidence regarding Wade's right arm restrictions. (Tr. 27).

Dr. Pithadia opined that Wade could handle objects only with her left hand, could only occasionally reach above her shoulders and down to the floor, could frequently reach down to waist level, and could lift 5 to 10 pounds with the left hand, and that these restrictions affected Wade's daily and occupational functioning. (Tr. 27). However, the ALJ gave this opinion only partial weight, finding that the left arm restrictions were inconsistent with the evidence as a whole and noting that Dr. Pithadia had not treated Wade for this condition prior to completing the assessment. (Tr. 27).

The ALJ gave little weight to the opinion of Christopher Young, MA, CRC, who found that Wade was disabled from all work. (Tr. 27). The ALJ emphasized potential bias due the fact that Young was retained by Wade and the fact that the Young's report was subjective in nature and not based on hypotheticals, unlike the testimony of the VE. (Tr. 27). The ALJ also gave little weight to the opinion of physical therapist, Brooke Brooks, finding that Brooks's opinion that Wade was unable to frequently lift 10 pounds from floor to waist or occasionally lift 30 pounds from the floor contradicted the overall evidence since it placed restrictions on her left arm as well. (Tr. 27).

At step four, the ALJ determined that Wade was unable to perform her past relevant work. (Tr. 28). Considering Wade's age, education, work experience, and residual functional capacity, the ALJ concluded that there were jobs in the national economy that Wade could perform, including school bus monitor (113,000 jobs nationally), arcade attendant (27,000 jobs nationally), and parking lot attendant (136,000 jobs nationally). (Tr. 29-30). The ALJ found that

Wade had not been under a disability, as defined in the Social Security Act, from July 19, 2012 through the date of this decision, June 28, 2016. (Tr. 29).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence."). Courts have defined substantial evidence as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098. A court must affirm an ALJ's decision if the ALJ supported his findings with substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citations omitted). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C.**

**§ 423(d)(1)(A)**.  The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  **20 C.F.R. § 404.1520**.  The ALJ first considers whether the claimant is presently employed and "doing . . . substantial gainful activity."  **20 C.F.R. § 404.1520(b)**.  If she is, the claimant is not disabled and the evaluation process is over.  If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities."  **20 C.F.R. § 404.1520(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work.  If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled.  **20 C.F.R. § 404.1520(e)**.  However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  **42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f)**.

Wade has requested that the court reverse the ALJ's decision and award benefits, or in the alternative remand the matter for additional proceedings.  In her appeal, Wade has argued

that: (1) the RFC was not supported by substantial evidence; and (2) the ALJ improperly addressed her subjective complaints.

Wade has argued that the ALJ's RFC was not supported by substantial evidence. Wade contends that the ALJ treated the evidence supporting Wade's mental impairments and left arm pain improperly and assigned improper weights to the various medical experts' opinions. First, Wade has argued that the ALJ misrepresented the evidence and discounted her depression and anxiety, erroneously finding them not to be severe impairments and providing no relevant limitations in the RFC. In making this finding of non-severity, the ALJ emphasized that in Dr. Reff's third and final assessment he indicated that Wade was in the "maintenance stage of treatment" and that some drugs such as Cymbalta were helpful for Wade's depression. (Tr. 21). Wade has argued that neither the fact that her symptoms improved with some treatments nor the fact that she was in the "maintenance stage" of treatment implies that her mental impairment was non-severe.

In March of 2015, treating physician Dr. Reff opined that Wade was unable to function in any sustained work-related activity. The ALJ discounted this opinion on the grounds that it was inconsistent with Dr. Reff's own treatment records showing significant improvement in Wade's mental health symptoms and functioning. (Tr. 21). As the ALJ emphasized, Dr. Reff's treatment notes stated that Wade was "holding her own" and that there was "no evidence of active depression." (Tr. 20). Thus, the ALJ discounted Dr. Reff's opinion and found that while Wade's treatment records reflected some ups and downs in her anxiety and depression, longitudinally her mental health symptoms and functioning had improved significantly with medication and therapy. (Tr. 20).

A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. **20 C.F.R. § 404.1527(d)(2)**; *see Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013); ***Punzio v. Astrue***, 630 F.3d 704, 710 (7th Cir. 2011); ***Schmidt v. Astrue***, 496 F.3d 833, 842 (7th Cir. 2007). Controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes. *Schmidt*, 496 F.3d at 842.

Dr. Reff's treatment notes indicated that Wade was feeling better on some days and that she improved at times in response to treatment. Yet, Dr. Reff found that Wade was unable to perform sustained work. As the Seventh Circuit has recognized, "symptoms that 'wax and wane' are not inconsistent with a diagnosis of recurrent, major depression," ***Larson v. Astrue***, 615 F.3d 744, 751 (7th Cir. 2010), and "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better and worse days." ***Bauer v. Astrue***, 532 F.3d 606, 609 (7th Cir. 2008) (finding "hopeful remarks" during some sessions did not justify discounting treating physician's opinion that claimant was unable to work). Also, improvement in response to treatment does not imply that a claimant's condition is not severe. ***Scott v. Astrue***, 647 F.3d 734, 739-40 (7th Cir. 2011).

Moreover, when a claimant has at least one severe impairment, she is entitled to have the ALJ evaluate whether the combination of her non-severe and severe impairments impose any functional limitations. This court has remanded where the ALJ failed to include any discussion of the plaintiff's non-severe mental impairments in the RFC analysis. *See **McGill v Colvin***, 2015 WL 224779, at *11 (S.D. Ind. Jan. 13, 2015) ("By neglecting to include any discussion of Plaintiff's mental impairments in the RFC analysis, the ALJ . . . plainly did not provide 'a more

detailed' analysis of these impairments than he did at step 2, such that he failed to comply with SSR 96-8p."). Additionally, the fact that the ALJ discussed Wade's mental impairments during his earlier step two analysis does not save the ALJ's RFC assessment. The process "used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process" is "not an RFC assessment." SSR 96-8p, 1996 WL 374184 (July 2, 1996); *see also **Paar v. Astrue,*** 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012) ("[L]imitations determined at Step 2 under the special technique are not a substitute for a RFC finding.").

Next, Wade has argued that the ALJ's RFC was not supported by substantial evidence insofar as it provided no restrictions specific to Wade's left arm. Emphasizing that there was no formal diagnosis regarding Wade's left wrist, the ALJ found that "the overall evidence [did] not support more restrictive limiting limitations than the light physical demand with her left hand with the additional postural and environmental limitations." (Tr. 28).

The court finds that the ALJ failed to substantiate his conclusion with an articulation of his reasoning. An ALJ cannot ignore an entire line of evidence "in the absence of an explicit and reasoned rejection." ***Zblewski v. Schweiker***, 732 F.2d 75, 78-79 (7th Cir. 1984). Rather, it is "absolutely essential" that the ALJ "articulate reasons . . . for crediting or rejecting particular sources of evidence." ***Zblewski***, 732 F.2d at 79. While the ALJ noted multiple reports of pain and hypersensitivity of the left hand due to increased use, as well as Dr. Anderson's recommendation that Wade use a left wrist brace, he nevertheless concluded with little explanation that the "evidence as a whole" did not support "any limitation regarding the left upper extremity." (Tr. 25). In making that conclusion, the ALJ also improperly failed to consider Wade's long-term use of the left-wrist brace. *See **Gaylor v. Astrue***, 292 F. App'x 506, 515 (7th Cir. 2008) ("It is unlikely [a claimant] would endure[]" significant treatment "for pain

that did not exist, just to increase the credibility of [a] social security claim."). The court finds that the ALJ's opinion falls below the standard of articulation required when ignoring or discounting a line of evidence.

The court also finds that the ALJ's reasoning for assigning little weight to physical therapist, Brooke Brooks's opinion regarding the left arm was inadequate. Brooks opined that Wade was unable to frequently lift about 10 pounds from floor to waist or occasionally lift 30 pounds from floor to shoulder, restrictions that applied to both arms. (Tr. 27). The Seventh Circuit has recognized that "physical therapists tend to be consulted for chronic problems . . . ('chronic' implying not fully responsive to medical treatment)" on "the question of ability to work" because on this question "physical therapists have significant expertise." *Barrett v. Barnhart*, 355 F.3d 1065, 1067–68 (7th Cir.), on reh'g, 368 F.3d 691 (7th Cir. 2004).

Nevertheless, the ALJ justified discounting Brooks's opinion as it applied to the left arm merely by saying that "the evidence does not support less than light demand lifting with that extremity." (Tr. 27-28). An ALJ "cannot disregard medical evidence simply because the evidence is at odds with the ALJ's own unqualified opinion." *Murphy ex rel. Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). Regardless of the source, the ALJ must weigh Brooks's opinion using the same factors as those set out in **20 C.F.R. § 404.1527(c).** These factors include: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) supportability; 4) consistency with the record as a whole; and 5) whether the medical source was a specialist in the relevant area. **20 C.F.R. § 404.1527(c)(1)-(5).** An ALJ need not explicitly mention every factor, so long as his decision shows that he "was aware of and considered many of the factors." *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013). The court finds the ALJ failed to consider these factors

and articulate his reasoning as required when discounting a medical opinion.

Wade has argued that the ALJ improperly reduced the weight assigned to multiple treating source opinions. As already discussed, the ALJ improperly reduced the weight of Dr. Reff's opinion after erroneously concluding that the opinion was inconsistent with his treatment notes. Wade also has argued that the ALJ improperly assigned Dr. Pithadia's opinion partial weight. The ALJ defended discounting Dr. Pithadia's opinion on the grounds that Dr. Pithadia had not treated Wade for any issues related to her extremities before providing his opinion. (Tr. 26). The court finds that the ALJ's assignment of partial weight to Dr. Pithadia's opinion was proper given Dr. Pithadia's limited history of treatment of Wade's impairment. *See* **20 C.F.R. § 404.1527(c)(i)** ("When the treating source has seen you . . . long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight . . . "); **20 C.F.R. § 404.1527(c)(ii)** ("[T]he more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion . . ."). The ALJ considered and articulated his reasoning for discounting Dr. Pithadia's opinion, especially noting the length and the nature and extent of the treatment relationship.

However, Wade contends that the ALJ's assignment of weights was inconsistent. Although Dr. Pithadia did not treat Wade for her left arm neither did the state consultants whose opinions the ALJ assigned great weight. However, the court recognizes that "[s]tate agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in evaluation of the medical issues in disability claims under the Act . . ." and that "[i]n appropriate circumstances, [their opinions] . . . may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6P, 1996 WL 374180 at *2 (July 2, 1996).

Wade also has argued that the ALJ improperly discounted Dr. Nath's opinion. The ALJ assigned partial weight to Dr. Nath's opinion, finding that although Dr. Nath's right-hand restrictions and lack of left-hand restrictions were consistent with the overall evidence, her recommendation that Wade be limited to a 4-hour work day was not. (Tr. 24). An ALJ may assign less weight to a treating medical source's opinion if it is lacking in explanation. *See* **20 C.F.R. § 404.1527(c)** ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). As Wade suggests, it is possible that Dr. Nath would have justified the 4-hour workday restriction on the grounds that Wade could not sustain an 8-hour workday with the use of only one arm. However, given that Dr. Nath did not provide any such explanation and explicitly provided no left-arm restrictions, the court finds that the ALJ did not err in discounting Dr. Nath's opinion regarding the need for a 4-hour workday.

Next, Wade has argued that the ALJ erred in improperly addressing plaintiff's subjective complaints. An ALJ's evaluation of subjective symptoms will be upheld unless it is patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012). Nevertheless, an ALJ must support his evaluation with specific reasons that are supported by the record. *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013). On March 28, 2016, Social Security Ruling 16-3p became effective and issued new guidance regarding the evaluation of a disability claimant's statements about the intensity, persistence, and limiting effects of symptoms. *See* SSR 16-3p, 2016 WL 1237954 (Mar. 28, 2016). Under SSR 16-3p, an ALJ must assess the claimant's subjective symptoms rather than assessing her "credibility."

Under SSR 16-3, the ALJ must first determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce her symptoms. SSR 16-3p, 2016 WL 1119029, at *2. Then, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p, 2016 WL 1119029, at *2. An individual's statements about the intensity and persistence of the pain may not be disregarded because they are not substantiated by objective medical evidence. SSR 16-3p, 2016 WL 1119029 at *5. In determining the ability of the claimant to perform work-related activities, the ALJ must consider the entire case record, and the decision must contain specific reasons for the finding. SSR 16-3p, 2016 WL 1119029, at *4, 9. The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1) The individual's daily activities;

(2) Location, duration, frequency, and intensity of pain or other symptoms;

(3) Precipitating and aggravating factors;

(4) Type, dosage, effectiveness, and side effects of any medication;

(5) Treatment, other than medication, for relief of pain or other symptoms;

(6) Other measures taken to relieve pain or other symptoms;

(7) Other factors concerning functional limitations due to pain or other symptoms.

**20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).**

Upon considering Wade's subjective complaints, the ALJ concluded that Wade's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence as a whole. (Tr. 23). In reaching this conclusion, the ALJ

18

emphasized the fact that Wade's pain and tremors improved with some medications and the fact that Wade was able to take care of her personal needs, cook meals, complete some housework, and drive a few times per week.  (Tr. 28).

Wade contends that the ALJ failed to explain why he found that Wade's subjective complaints were not supported by the overall evidence.  Moreover, Wade also has argued that the ALJ failed to build a logical bridge between the evidence that Wade was able to perform some daily activities and his finding that she could perform light work on a sustained basis.  Additionally, Wade has argued that the ALJ erred in failing to consider her extensive treatment and work history.  However, a good work history "is still just one factor among many, and it is not dispositive." *Summers v. Berryhill*, 864 F.3d 523, 529 (7th Cir. 2017) (internal quotation marks and citation omitted); *see also* **20 C.F.R. § 404.1529(c)(3).**

The Commissioner has emphasized that the ALJ's determination regarding subjective symptoms should be overturned only if patently wrong.  *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).  The Commissioner contends that the ALJ discussed Wade's daily activities, and that he primarily relied on medical evidence of the record and the medication Wade took to alleviate her pain and other symptoms.  The Commissioner noted that ALJ justified his determination on the grounds that Wade's statements contradicted Dr. Nath's records.  According to those records, in early 2013 Wade's medications were controlling her pain "pretty well," and Ambien was helping with both pain as well as tremors.

The ALJ has considered some of the regulatory factors as set forth in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  The Seventh Circuit has repeatedly criticized the "recurrent, deplorable, feature of opinions by administrative law judges" of placing significant weight in this type of evidence without recognizing the significant differences between daily activities and the

sustained work required by full-time employment.  *See* ***Bjornson v. Astrue***, 671 F.3d 640, 647 (7th Cir. 2012); ***Punzio v. Astrue***, 630 F.3d 704, 712 (7th Cir. 2011).  These differences "are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer."  ***Bjornson***, 671 F.3d at 647.  In concluding that Wade's subjective complaints were not consistent with overall evidence, the ALJ emphasized that while Wade had some difficulty with speed of her activities of daily living, she was able to take care of her personal needs, cook meals, complete some housework, and drive a few times per week." (Tr. 28).  This discussion failed to demonstrate a recognition of the differences between daily activities and full-time employment.

The ALJ must evaluate the "intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities."  SSR 16-3p, 2016 WL 1119029, at *2.  In concluding that Wade was not as limited in her ability to do basic work activities as she alleged, the ALJ considered Dr. Nath's records from 2013 indicating that Ambien was helping Wade's pain and tremors.  (Tr. 25).  As indicated by Wade, the ALJ failed to recognize that Ambien is a sleep medication used to mitigate Wade's symptoms at night, and thus is irrelevant to the question of whether Wade is able to perform basic work activities during the day at a job.  The court finds that on remand the ALJ may reevaluate Wade's subjective symptoms in accordance with SSR 16-3p.

Wade has requested that the court remand for an award of benefits.  An award of benefits is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for

disability benefits." ***Allord v. Astrue***, 631 F.3d 411, 415 (7th Cir. 2011). The Seventh Circuit has held that when an ALJ's decision is not supported by substantial evidence, the appropriate remedy is to remand for further proceedings unless the evidence before the court compels an award of benefits. ***Briscoe v. Barnhart***, 425 F.3d 345, 355 (7th Cir. 2005). The record here does not warrant an award of benefits.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED** for further proceedings consistent with this Order.

ENTERED this 4th day of October, 2018.

/s/ Andrew P. Rodovich
United States Magistrate Judge